## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TAMMY COVINGTON and JEFFREY COVINGTON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 19-cv-00718-PRW |
| CSAA FIRE AND CASUALTY INSURANCE, d/b/a AAA FIRE AND CASUALTY INSURANCE COMPANY, INC., | ) ) ) ) ) | |
| Defendant. | ) ) | |

---

**DEFENDANT, CSAA FIRE AND CASUALTY INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

Respectfully submitted,

Gerard F. Pignato, OBA No. 11473
Matthew C. Kane, OBA No. 19502
Joshua K. Hefner, OBA No. 30870
RYAN WHALEY COLDIRON JANTZEN
  PETERS & WEBBER, PLLC
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
Telephone:   405-606-3333
Facsimile:   405-606-3334
Email:    jerry@ryanwhaley.com
            mkane@ryanwhaley.com
            jhefner@ryanwhaley.com
ATTORNEYS FOR DEFENDANT

Dated:  March 2, 2020

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii, iii, iv

BRIEF IN SUPPORT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Undisputed Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Argument and Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    I.      No Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

          A.    Constant or Repeated Leakage.. . . . . . . . . . . . . . . . . . . . . .  12

          B.    Faulty Construction or Repair.. . . . . . . . . . . . . . . . . . . . . .  13

          C.    Fungi and Mold. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

    II.     No Bad Faith Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

          A.    No Breach of Contract Means No Bad Faith in the Instant
               Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

          B.    No Bad Faith Damages Means No Bad Faith Claim. . . . . . . .  17

          C.    No Evidence That a More Thorough Investigation Would
               Make a Difference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    III.    Punitive Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*4100 Perimeter Ltd. P'ship v. Hartford Cas. Ins. Co.,*
    2015 WL 5008410 (W.D. Okla. Aug 20, 2015)............................ 15

*American Home Assur. Co.,*
    1977 OK 141, 577 P.2d 899.......................................... 14

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986)............................................... 10

*Badillo v. Mid Century Ins. Co.,*
    2005 OK 48, 121 P.3d 1080..................................... 14, 15

*Ball v. Wilshire Ins. Co.,*
    2009 OK 38, 221 P.3d 717...................................... 15, 17

*Buzzard v. McDanel,*
    736 P.2d 157 (Okla. 1987)..................................... 16, 18

*Cardoso v. Calbone,*
    490 F.3d 1194 (10th Cir. 2007)................................... 10

*Cates v. Integris Health, Inc.,*
    2018 OK 9, 412 P.3d 98........................................... 11

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)............................................... 10

*Christian v. American Home Assur. Co.,*
    1977 OK 141, 577 P.2d 899........................................ 14

*City National Bank and Trust Co. v. Jackson National Life Insurance,*
    1990 OK CIV APP 89, 804 P.2d 463................................ 15

*Cooper v. National Union Fire Ins.,*
    1996 OK CIV APP 52, 921 P.2d 1297............................... 19

*Dalton v. LeBlanc,*
    350 F.2d 95 (10th Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Davis-Travis v. State Farm Fire & Cas. Co.,*
    336 F. App'x 770 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Duensing v. State Farm Fire & Cas. Co.,*
    2006 OK CIV APP 15, 131 P.3d 127. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Equity Ins. Co. v. City of Jenks,*
    2008 OK 27, 184 P.3d 541. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garnett v. Government Employees Ins. Co.,*
    2008 OK 43, 186 P.3d 935. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Houchin v. Hartford Life Ins. Co.,*
    2016 WL 502075 (W.D. Okla. Feb. 8, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Inks v. USAA Gen. Indem. Co.,*
    2018 WL 3589116 (N.D. Okla. June 27, 2018). . . . . . . . . . . . . . . . . . . . . 11, 17

*Manis v. Hartford Fire Ins. Co.,*
    1984 OK 25, 681 P.2d 760. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McCorkle v. Great Atlantic Ins. Co.,*
    637 P.2d 583 (Okla. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McCoy v. Okla. Farm Bureau Mut. Ins. Co.,*
    1992 OK 43, 841 P.2d 568. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McLaughlin v. National Benefit Life Insurance Co.,*
    1988 OK 41, 772 P.2d 383. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Navarez v. State Farm Mut. Auto. Ins. Co.,*
    989 P.2d 1051 (Okla. Civ. App. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Oulds v. Principal Mut. Life Ins. Co.,*
    6 F.3d 1431 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Sims v. Great American Life Ins. Co.,*
    469 F.3d 870 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Skinner v. John Deere Ins. Co.*,
   2000 OK 18, 998 P.2d 1219. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Travelers Insurance Company v. Morrow*,
   645 F.2d 41(10th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Vickers v. Progressive Northern Insurance Company*,
   353 F.Supp.3d 1153 (N.D. Okla. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Willis v. Midland Risk Ins. Co.*,
   42 F.3d 607 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## **Other Authorities**

Fed.R.Civ.P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

L.Cv.R. 56.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

23 O.S. § 9(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

OUJI-CIV No. 22.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

OUJI-CIV No. 22.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

OUJI-CIV No. 22.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Defendant CSAA Fire and Casualty Insurance Company ("CSAA") moves this Court, pursuant to Rule 56, FED.R.CIV.P., and L.CV.R. 56.1, to enter summary judgment in favor of this Defendant and against Plaintiffs in their entirety.  Plaintiffs' claim for damages to their home arises from:  (1) constant or repeated seepage of water; and (2) faulty construction. Not only was this damage confirmed by CSAA's experts, <u>Plaintiffs' own expert confirmed the same two issues</u>.  The damage to Plaintiffs' property is expressly excluded under the terms of their policy.  As a result, Plaintiffs' claim fails as a matter of law.

## <u>UNDISPUTED MATERIAL FACTS</u>

1.      Plaintiffs' home was insured under a policy issued by CSAA, policy number HO5-004008561 (the "Policy"). *See* Claim File, **EXHIBIT 1**, CSAA_COVINGTON 0312.

2.      The Policy provides in pertinent part:

SECTION I PERILS INSURED AGAINST

We insure against risk of direct physical loss to property described in Coverages A, B and C.

We do not insure, however, for loss:

A. Under Coverages A, B and C:

  1. Excluded under Section I Exclusions;
  2. Caused by:

    d. Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor is unknown

1

to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

*Id.* at CSAA_COVINGTON 0389;

SECTION I EXCLUSIONS

A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

"Fungi", Wet Or Dry Rot, Or Bacteria
"Fungi", Wet Or Dry Rot, Or Bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

This exclusion does not apply:

a. When "fungi", wet or dry rot, or bacteria results from fire or lightning; or
b. To the extent coverage is provided for in the "Fungi", Wet Or Dry Rot, Or Bacteria Additional Coverage under Section I Property Coverages with respect to loss caused by a Peril Insured Against other than fire or lightning. Direct loss by a Peril Insured Against resulting from "fungi", wet or dry rot, or bacteria is covered.

*Id.* at CSAA_COVINGTON 0390; and

B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.
...
3. Faulty, inadequate or defective:
...
b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
c. Materials used in repair, construction, renovation or remodeling; or
d. Maintenance;

of part or all of any property whether on or off the "residence premises".

2

*Id.* at CSAA_COVINGTON 0352.

3.      On or about August 8, 2017, or August 17, 2017, Plaintiff's home, while insured by the Policy, suffered a noticeable water leak. *Id.* at CSAA_COVINGTON 0191, 0669.

4.      Rather than notifying CSAA of the incident, Plaintiffs cleaned up the water and used fans to superficially dry the home. *Id.* at CSAA_COVINGTON 0669.  Plaintiffs did not contact professional mitigations services or leak detection. *Id.* at CSAA_COVINGTON 0663.[1]

5.      To this day, Plaintiffs have not conducted any mitigation efforts to the subject property. Deposition of Mr. Covington, **EXHIBIT 2**, 194:14-25.

6.      A few days after the Plaintiffs first noticed the water damage in August, 2017, Mr. Covington was in the crawlspace of the home when he noticed that "there was sweating of the pipe under the house" and "[i]t was dripping straight onto the dirt." *Id.* at 158:12-159:11.

7.      On Mothers' Day, May 13, 2018, Plaintiffs were visited by Ian Rupert, Mrs. Covington's brother (and Mr. Covington's brother-in-law), who works as a public adjustor.

---

[1] Plaintiffs thus failed to timely notify CSAA of the event or take contractually required steps to mitigate. *Id.* at CSAA_COVINGTON 0353 ("In case of a loss to covered property…[t]hese duties must be performed by you…1. Give prompt notice to us or our agent); CSAA_COVINGTON 0379 ("In case of an 'occurrence', you…will…[g]ive written notice to us or our agent as soon as practical…") and CSAA_COVINTON 0390 ("In the event of a 'water' loss, you…must immediately, or as soon as practicable, take all reasonable and necessary steps to dry the property and protect the property from contamination of mold or 'fungi.'").

*See* Claim File, **EXHIBIT 1**, CSAA_COVINGTON 0669.  Mr. Rupert noticed the moisture damages to the floor.  *Id.*

8.      On May 15, 2018, Mr. Covington contacted CSAA to initiate a claim, nine months after the reported incident. *Id.* at CSAA_COVINGTON 0606-607.

9.      This was the only communication either Plaintiff made with CSAA regarding their claim. *See* Deposition of Mr. Covington, **EXHIBIT 2**, 172:25-173:5; *see also*, Deposition of Mrs. Covington, **EXHIBIT 3**, 11:13-18.

10.     Despite first being told about the water damage nine months after the Plaintiffs first noticed water damage, CSAA did not deny the claim during the phone call with Mr. Covington. Deposition of Mr. Covington, **EXHIBIT 2**, 153:1-3.

11.     To the contrary, CSAA told Mr. Covington that a field adjuster would be sent out to the subject property. *Id.* at 148:13-21.

12.     Thereafter, Mr. Rupert handled all communications with CSAA regarding Plaintiffs' claim.  Mr. Rupert engaged in multiple calls, wrote the relevant correspondence, and attended the inspection (which Plaintiffs did not).   Claim File, **EXHIBIT 1**, CSAA_COVINGTON 0253, 0662.

13.     CSAA utilized three different individuals to conduct a site inspection on Plaintiffs' home. *See* UMF 14-16.

14.     Alan Heise, the AAA Field Adjuster, conducted an inspection on July 6, 2018.  He provided the following report:

Multiple water rings were evident on framing, subfloor and drywall.[2] It appears possible multiple overflows of varying volume may have occurred. The subfloor was in generally poor condition under the furnace stand. Damage was evident throughout the home to prefinished solid bamboo floor. The insured had previously detached baseboards in bedroom 1 on the common wall with the furnace room and in hallway two which provided partial cross section views of floor layers. It appears the bamboo floor was installed directly over the structural subfloor and no vapor barrier was present. Crawlspace photos were received from the Public Adjuster and do not show any vapor barrier to be present on the underside of the subfloor or on the ground. Although flooring damage was found throughout the home, limited baseboard or other damage was found to indicate a large volume of water escaped the generally centrally located furnace room and ran through multiple rooms and doorways. Damage typically found in homes after large water leaks to other items such as cabinets, drywall, doors, door jambs, casing, baseboards and personal property were not found in proportion to the floor damage or claimed by the insured's public adjuster. I contacted plumbing company Hi-Tech Plumbing and Leak Detection in Edmond, OK to perform a leak detection by inspecting the crawlspace and fixtures and running cameras through drain lines. Their report has been received and is located in the claim documents. Additionally, I contacted flooring company Boardwalk Flooring for information on the bamboo floor installation and damage. Their report has been received and was sent to the senior adjuster. After inspection of the home and review of Hi-Tech Plumbing and Leak Detection and Boardwalk Flooring reports, it appears the cause of the majority of the floor damage throughout the home is due to a lack of moisture barriers and inadequate crawlspace ventilation. It appears humidity in the crawlspace caused general swelling or expansion of the wood floor throughout the home. During drier seasons it appears the floor has contracted, but the polyurethane finish was damaged creating a bubbled and cracked appearance in many areas. Moisture readings were found to be elevated in most areas of the home, however, some drier areas specifically in the master bedroom were very near exterior crawlspace vents. This appears to corroborate the conclusion the crawlspace has inadequate ventilation. The report by Hi-Tech Plumbing appears to indicate this may have been affected by floor plan changes or additions which may have covered up or would have required additional exterior vents. Generally high moisture over a period of

---

[2] Mr. Heise's report was supported by photos reflecting his opinion. *See e.g.,* **EXHIBIT 1** at CSAA_COVINGTON 0033, 0038 (showing multiple water rings described in the opinion); CSAA_COVINGTON 0088 (showing direct installation of flooring over subfloor without water barrier); and CSAA_COVINGTON 0151, 0164 (moisture readings lower near vents).

months years appears to have gradually and progressively damaged the bamboo flooring throughout the home…Moisture readings were found to be elevated in most areas of the home, however, some drier areas specifically in the master bedroom were very near exterior crawlspace vents. This appears to corroborate the conclusion the crawlspace has inadequate ventilation. The report by Hi-Tech Plumbing appears to indicate this may have been affected by floor plan changes or additions which may have covered up or would have required additional exterior vents. Generally high moisture over a period of months years appears to have gradually and progressively damaged the bamboo flooring throughout the home.

Claim File, **EXHIBIT 1**, at CSAA_COVINGTON 0606-607.

15.     Matthew Amick of Hi Tech Plumbing & Leak Detect performed an inspection of the plumbing of the home on June 1, 2019.  He concluded:

I also found the humidity level to be so high that the PVC building condensation drain is sweating and dripping water under the home. I found that the building condensation drain is not sweating above the subfloor. While inspecting the condensation drain I found the condensation drain to be improperly installed by using an S-trap. I found a running trap in the condensation drain under the home. I recommend removing these two traps and installing the correct trap in the line under the home, and moving the drain from the fresh air plenum back into the wall. While performing the inspection I found lots of mold and mildew to be growing on the trusses, on the brick bracing, and on the stem walls under the original portion of the home. I also found the mold and mildew to extend two feet into the east room add on portion of the home. I found the dirt under the home to be damp in the majority of the crawl space except under the east add on and close to the crawl space access. The remaining trusses and subfloor in the east add on are showing less mold and mildew. After inspecting the crawl space and plumbing I walked the perimeter of the home and found only two vents for the crawl space of the home. I also found more than one section of them stem wall that has been filled with brick where a crawl space vent could have been located. I believe that the improper installation of the condensation drain contributed to the clogging and overflowing over the HVAC drain into the home. I also believe that the lack of proper crawl space ventilation has caused high humidity and condensation on the wood under the home.

*Id.* at CSAA_COVINGTON 0450.

6

16.     Danny Griffin of Boardwalk Flooring, during his inspection on July 6, 2019, reported high water moisture readings throughout the home and water damage near the leaking air-conditioning unit.  He suspected that "the AC was leaking for quite some time causing water to get trapped under the flooring and between the barrier, if any."  *Id.* at CSAA_COVINGTON 0449.

17.     On July 10, 2019, CSAA denied the claim based on the issues with the construction of the home and the lack of maintenance of the air-conditioning condenser resulting in constant or repeated seepage of water for weeks, months, or years resulting in visible water damage and mold. *Id.* at CSAA_COVINGTON 0445.  Specifically, CSAA provided:

> After conducting an inspection, a report was prepared which includes detailed findings of the inspection and a determination that the damage was caused by improper construction as there is not enough ventilation in the crawlspace along with a lack of maintenance to the AC condenser drain line allowing for constant or repeated seepage of [*sic*] leakage of water over a period of weeks, months, or years resulting in visible water damage throughout the home and mold in the furnace room.

*Id.*

18.     Subsequent to the initial denial, Plaintiffs provided CSAA with an engineering report from Don Ray Sharp, PE. *Id.* at CSAA_COVINGTON 0464-471.  Mr. Sharp conducted his inspection on June 6, 2018. *Id.* at CSAA_COVINGTON 464.  He concluded:

> During inspection, the crawlspace was extremely humid and evidence of mildew and mold was witnessed in the subfloor, and to a lesser extent in the floor joists.

> ***

7

[T]here is definite evidence of water flow along the wall and framing of the utility closet…Because the surface flooring was not glued, this water flow would spread out in the voids between the finish floor and the subfloor and would continue until being absorbed into the wood or seeping into the crawlspace below.

The engineer estimates that 110-120 gallons of water would be required, at a minimum, to account for the deterioration witnessed.  While this is not impossible over the course of 1 day, it is not likely.  This author believes that, given the weather conditions and the size of the unit, this particular air conditioner would produce 0.50-.75 gallons per hour (roughly 15 gallons per day).

It is the opinion of this author that the damage occurred over multiple days (and possibly several weeks).  The engineer believes that once the clog manifested in the drain line of the HVAC, the property owners were oblivious to the water flow for some time.  It was only after the subfloor had become fully saturated that the water discharge backed up enough to become evident on the surface.  It is likely that during this time, there was continuous standing water in the utility closet, seeping into the spaces between the surface and subfloor; unless the owners had reason to open the utility closet, they would have remained oblivious to the ongoing damage.

\*\*\*

The subfloor is contaminated with white mold and the engineer encourages replacement to prevent any health issues which may arise for the residents, as well as the development of black mold...

*Id.* at CSAA_COVINGTON 0464-0466.

19.     CSAA reviewed the additional report from Mr. Sharp which further confirmed the basis of CSAA's denial. *See* July 19, 2018, Letter to Ian's Enterprise, LLC, *id.* at CSAA_COVINGTON 0571.

20.     Mr. Covington testified that during his one and only phone call with CSAA, involving CSAA representative Heather Davis, Ms. Davis had a "raised voice" that made Mr. Covington feel like he was "being scolded by a teacher." Deposition of Mr. Covington,

**EXHIBIT 2**, 178:7-12. Mr. Covington could not point to any other time in which CSAA allegedly acted in any way unprofessionally toward himself or his wife. *Id.* at 178:15-18. Mr. Covington further stated he "would assume" Heather Davis "may have been a little shocked that AAA was first contacted nine months after the actual incident took place," particularly when the applicable insurance contract states the Plaintiffs have a "duty to promptly notify AAA of a loss." *Id.* at 152:9-21.

21.    Mr. Covington has no complaint about the timeliness of CSAA's investigation. *Id.* at 181:8-25.

22.    When asked what additional action CSAA could have taken to make Mr. Covington feel the investigation was proper, Mr. Covington said CSAA "could have hired an engineer." *Id.* at 201:3-23. However, Mr. Covington was not aware of any information an engineer hired by CSAA could have identified that the Plaintiffs' own engineer, Don Sharp, did not identify. *Id.* at 201:24-202:16.

23.    Mr. Covington was unable to identify damage(s) he suffered as a result of the alleged bad faith actions of CSAA. *Id.* at 205:9-207:6.

24.    Mr. Covington denied: (1) suffering any financial loss (*Id.* at 202:17-19); (2) having any mental pain and suffering (*Id.* at 204:4-7); (3) seeing a counselor (*Id.* at 204:13-16); and (4) suffering a loss of reputation in the community (*Id.* at 213:21-24).

25.    Likewise, Mrs. Covington denied that, as a result of CSAA's handling of the she: (1) suffered any financial loss (Deposition of Mrs. Covington, **EXHIBIT 3**, 67:19-22); (2) had mental pain and suffering (*Id.* at 68:7-10); and (3) suffered a loss of reputation in the community (*Id.* at 67:23-68:6).

26.     When asked about what she could point to that shows the actions of CSAA were in bad faith, Mrs. Covington identified: (1) the phone call between Mr. Covington and Heather Davis of CSAA to which she was not a party; and (2) her belief that CSAA should have notified the Plaintiffs that CSAA would not cover damage resulting from faulty or improper construction.[3] *Id.* at 73:5-17.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing a motion for summary judgment must offer evidence of specific facts, in admissible form, sufficient to raise "a genuine issue of material fact." *See, Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). Conclusory allegations or denials do not suffice. *See, Id.* at 248. Moreover, opposition to summary judgment "must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir.

---

[3] The second issue that Mrs. Covington raised regarding alleged bad faith is not an example of bad faith recognized in Oklahoma. Instead, an insured is chargeable with knowledge of the terms of their insurance policy, and has the duty to read and know the contents thereof, and is bound by the legal effect of its terms and provisions; furthermore, an insurer owes no duty to explain a policy to an insured. *See Vickers v. Progressive Northern Insurance Company*, 353 F.Supp.3d 1153, 1164 (N.D. Okla. 2018) (applying Oklahoma law); *Travelers Insurance Company v. Morrow*, 645 F.2d 41, 44 (10th Cir. 1981) (applying Oklahoma law); and *Dalton v. LeBlanc,* 350 F.2d 95, 97 (10th Cir. 1965) (applying Oklahoma law).

2007). Here, the undisputed material facts foreclose Plaintiff's claims for breach of contract

and bad faith as a matter of law. The Court should grant summary judgment.

<u>**ARGUMENT AND AUTHORITIES**</u>

**I.      NO BREACH OF CONTRACT**

"Under Oklahoma law, '[i]nsurance policies are contracts and they should be

construed as every other contract−according to its terms where it is not ambiguous.'" *Inks*

*v. USAA Gen. Indem. Co.*, No. 17-CV-00210-GKF-FHM, 2018 WL 3589116, at \*4 (N.D.

Okla. June 27, 2018), *quoting Equity Ins. Co. v. City of Jenks*, 2008 OK 27, 184 P.3d 541,

544.  "To recover for breach of contract, a plaintiff must establish: '(1) the formation of a

contract, (2) breach of the contract, and (3) damages as a result of that breach.'" *Id., quoting*

*Cates v. Integris Health, Inc.*, 2018 OK 9, 412 P.3d 98.

Plaintiffs seek payment under the policy at issue for damages related to a leak from

their air-conditioning unit drain.  However, the policy excludes the damage on multiple,

unambiguous grounds.[4]

---

[4] The policy explicitly provides: "We do not insure for loss caused directly or
indirectly by any of the following. Such loss is excluded regardless of any other cause or
event contributing concurrently or in any sequence to the loss. These exclusions apply
whether or not the loss event results in widespread damage or affects a substantial area."
CSAA_COVINGTON 0348.

Oklahoma has interpreted such provisions, concluding they are unambiguous and
enforceable.  *See Duensing v. State Farm Fire & Cas. Co.,* 2006 OK CIV APP 15, ¶¶ 17-
21, 131 P.3d 127, 133–34; *see also Davis-Travis v. State Farm Fire & Cas. Co.*, 336 F.
App'x 770, 772 (10th Cir. 2009) (applying and quoting pertinent portions of Duensing).
Thus, so only as one of these exclusions is applicable, there is no coverage.  However, it is
plainly apparent here that all apply.

### A.  Constant or Repeated Leakage

The Policy specifically excludes:

Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

UMF 2.

The provision could not be more unambiguous or on point.  Here, all three of CSAA's inspectors indicated that the cause was constant or repeated seepage or moisture/humidity.  UMF Nos. 14-16.   CSAA expressly denied coverage on this basis: "constant or repeated seepage of [*sic*] leakage of water over a period of weeks, months, or years resulting in visible water damage throughout the home and mold in the furnace room." UMF 17.  Additionally, Plaintiffs' own expert provided: "The engineer estimates that 110-120 gallons of water would be required, at a minimum, to account for the deterioration witnessed.  While this is not impossible over the course of 1 day, it is not likely…It is the opinion of this author that the damage occurred over multiple days (and possibly several weeks)…It is likely that during this time, there was continuous standing water in the utility closet, seeping into the spaces between the surface and subfloor…" UMF 18.

Lastly, the Plaintiffs knew about the water leakage at the very earliest on August 8, 2017. UMF 3. A few days after first discovering the water issue, Plaintiff Jeffrey Covington saw water dripping from the HVAC drain line onto the ground in the crawlspace. UMF 6.

### B. Faulty Construction or Repair

The Policy also specifically excludes coverage for damages arising from faulty construction or repair.  UMF 2 ("We do not insure for loss to property…caused by…faulty, inadequate or defective…repair, construction [or] renovation").  Here, CSAA's experts identified several critical issues related to the construction and/or renovation of the home. These included: (1) inadequate ventilation to the crawl space, due at least in part to one of the vents having been bricked up – this cause was further evidenced by the fact that moisture readings were lower near the two vents that remained; (2) lack of a moisture barrier between the bamboo floor and the subfloor; and (3) an improperly installed drain. UMF Nos. 14-16.

In addition to the issues, Plaintiffs' own expert found faulty construction regarding the way in which the wood flooring was installed. Specifically, he stated that "[b]ecause the flooring was not glued, th[e] water flow would spread out in the voids between the finish [*sic*] floor and the subfloor"  UMF 18. Taken together, the faulty construction that lead to the high moisture and the constant/repeated leaking of the HVAC drain are undeniably valid reasons to deny Plaintiffs' claim.

### C. Fungi and Mold

The Policy also provided: "We do not insure for loss caused directly or indirectly by "Fungi", Wet or Dry Rot, Or Bacteria, meaning the presences, growth, proliferation, spread or dry rot or bacteria."  UMF 2.  Once again, the existence and prevalence of mold is undisputed.  UMF Nos. 15, 18.  Such damages were plainly excluded by the applicable policy. UMF 2.

There simply is no coverage for the damages to Plaintiffs' home. No evidence Plaintiffs can proffer will change the fact that Plaintiffs' damages are excluded under the Policy. CSAA's Motion for Summary Judgment should be granted.

## II.    NO BAD FAITH CONDUCT

The Oklahoma Supreme Court first recognized the tort of bad faith in *Christian v. American Home Assur. Co.*, 1977 OK 141, 577 P.2d 899.  "[A]n insurer has an implied duty to deal fairly and act in good faith with its insured and . . . the violation of this duty gives rise to an action in tort." *Id.* at 904. The duty of good faith does not require an insurer to pay every claim made by an insured, and there may be valid disagreements between the parties.  *Id.* at 905. *See also Badillo v. Mid Century Ins. Co.,* 2005 OK 48 ¶ 28, 121 P.3d 1080, 1093 ("[t]he essence of an action for breach of the duty of good faith and fair dealing 'is the insurer's unreasonable, bad-faith conduct'"); *Skinner v. John Deere Ins. Co.*, 2000 OK 18, ¶ 17, 998 P.2d 1219, 1223 (recognizing that insurer "acted reasonably as a matter of law and, thus, summary judgment was proper"); *Navarez v. State Farm Mut. Auto. Ins. Co.,* 1999 OK CIV APP 92 ¶13, 989 P.2d 1051, 1053 (citing *McCorkle v. Great Atlantic Insurance Co.*, 1981 OK 128, 637 P.2d 583) ("The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions").

> The elements of a bad faith claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury. ***The absence of any one of these elements defeats a bad faith claim.***

14

*Ball v. Wilshire Ins. Co.*, 2009 OK 38, ¶ 21, 221 P.3d 717, 724 (emphasis added); *see also, 4100 Perimeter Ltd. P'ship v. Hartford Cas. Ins. Co.*, No. CIV-14-0641-HE, 2015 WL 5008410, at *3 (W.D. Okla. Aug. 20, 2015), *citing Badillo v. Mid Century Ins. Co.,* 121 P.3d 1080, 1093 (Okla.2005).

*Badillo,* 121 P.3d at 1094, also clarified that "bad faith" requires a showing of "more than simple negligence."  This point was reiterated by the Oklahoma Supreme Court when it held that "a party prosecuting a claim of bad faith carries the burden of proof and must plead all of the elements of an intentional tort." *Garnett v. Government Employees Ins. Co.*, 2008 OK 43, 186 P.3d 935, 944. Thus, to prove a *prima facie* case of bad faith against CSAA, Plaintiffs must establish more than just a mistake or negligence.

As stated in *City National Bank and Trust Co.* v. *Jackson National Life Insurance,* 1990 OK CIV APP 89, ¶ 18, 804 P .2d 463, 468: "We…hold that before the issue of insurer's alleged bad faith may be submitted to the jury, the Trial Court must first determine, *under the facts of the particular case* and as a matter of law, whether insurer's conduct may be reasonably perceived as tortious." (Emphasis added). "[T]o establish such a claim, the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for [its determination]." *Houchin v. Hartford Life Ins. Co.*, No. CIV-14-522-D, 2016 WL 502075, at *6 (W.D. Okla. Feb. 8, 2016), citing *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993) and *McCoy v. Okla. Farm Bureau Mut. Ins. Co.*, 1992 OK 43, 841 P.2d 568, 572.

15

Thus, in evaluating an insurer's conduct in light of an allegation of bad faith, the Court may consider both the reasonableness of the conduct of the insurer in light of existing Oklahoma law at the time of the conduct, and the reasonableness of the insurer's conduct in light of the facts that are known or knowable to the insurer. *Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 612-13 (10th Cir. 1994) (applying Oklahoma law). Said differently, the action of the company "must be assessed in light of all of the facts known and knowable concerning the claim at the time the plaintiff requested the company to perform its contractual obligation." *Buzzard v. McDanel*, 1987 OK 28, 736 P.2d 157, 159.

### A.   No Breach of Contract Means No Bad Faith in the Instant Litigation.

Determining whether an insurer committed bad faith concerns an examination of the conduct of the insurer with respect to the particular insurance claim at issue over the time period when the insurer was requested to perform its contractual obligation to the insured. That is because the decisive question is whether the insurer "had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding payment under the policy." *Buzzard* v. *McDanel,* 1987 OK 28, ¶ 10, 736 P.2d 157, 159.

> "A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." *Id.* at 1093-94. "Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law." *Beers v. Hillory*, 241 P.3d 285, 293 (Okla. Civ. App. 2010); *see also Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 170-71 (Okla. 2000) ("[B]ad faith cannot exist if an insurer's conduct was reasonable under the circumstances.").

16

*Inks v. USAA Gen. Indem. Co.*, No. 17-CV-00210-GKF-FHM, 2018 WL 3589116, at *6 (N.D. Okla. June 27, 2018).

As discussed above, the policy explicitly provides that, if an excluded cause is one of any number of causes of the damage, the loss is not covered.  Constant and repeated seepage of water  is expressly excluded. Faulty construction/repairs is expressly excluded. Even if CSAA was ultimately wrong (which CSAA contests), CSAA certainly had reasonable bases to deny Plaintiffs' claim. CSAA did so based on the reports generated by its experts. UMF Nos. 14-17. Addtionally, Plaintiffs' own expert, Don Sharp, substantiated the determinations of CSAA when Mr. Sharp found there was, in fact, faulty construction and constant and/or repeated seepage.  UMF Nos. 18, 19.

### B.  No Bad Faith Damages Means No Bad Faith Claim.

Among the various elements required to establish bad faith, Plaintiff must prove the existence of damages.  *See e.g.,*  OUJI-Civ. No. 22.2 (including as an element of bad faith "the injury sustained by [Plaintiff]."); OUJI-Civ. No. 22.3 (same);  *Inks v. USAA Gen. Indem. Co.,* No. 17-CV-00210-GKF-FHM, 2018 WL 3589116, at *6 (N.D. Okla. June 27, 2018), *quoting Ball v. Wilshire Ins. Co.,* 2009 OK 38, 221 P.3d 717, 724.  In fact, the comments to OUJI-Civ. No. 22.4, which enumerates bad faith damages,  provide: "Any elements of damages that are not supported by the evidence should be omitted from the instruction."

Plaintiffs were unable to articulate damages they have suffered as a direct result of the alleged bad faith actions of CSAA. UMF Nos 23-25. In short, Plaintiffs cannot prove

the elements necessary for a bad faith claim because they have suffered no damages as a result of Defendant's alleged misconduct.

### C.  No Evidence that a More Thorough Investigation would Make a Difference.

Included among Plaintiffs' generic allegations of bad faith is an allegation that CSAA acted improperly in investigating Plaintiffs' claims.  Specifically, Plaintiffs contend that CSAA acted in bad faith by "fail[ing] to properly investigate the loss and claim." Petition, at ¶ 14.  However, Plaintiffs have no evidence that a more thorough investigation would result in a different outcome.  UMF 22. This lack of evidence precludes the Plaintiffs from pursuing a bad faith claim regarding the way in which CSAA handled the investigation:

> "Under Oklahoma law, ... an insurer's investigation need only be reasonable, not perfect." *Roberts v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 587, 592 (10th Cir. 2003) (unpublished) (citing *Buzzard*, 824 P.2d at 1109).[11] Accordingly, " 'when a bad faith claim is premised on inadequate investigation, the [claimant] must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information' that would have delegitimized the insurer's dispute of the claim." *Bannister*, 692 F.3d at 1128 (quoting *Timberlake*, 71 F.3d at 345). "[E]vidence of inadequate investigation must 'suggest a sham defense or an intentional disregard of uncontrovertible facts' in order to be put to a jury." *Id.*; *see also Oulds*, 6 F.3d at 1442.

*Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1317 (10th Cir. 2019).

As a result, Plaintiffs' bad faith claim predicated on CSAA's investigation, even if it survived the lack of any element of damages, should not be presented to the jury.  Similarly, CSAA could not have acted in bad faith by "fail[ing] to assist its insured in adjusting the loss or presenting the claim," "timely pay the claim" or "refus[e] to pay the amount of loss

on a covered claim," Petition, ¶ 14, when the undisputed facts simply did not support coverage.

## III.   PUNITIVE DAMAGES

As established by the undisputed facts, CSAA's denial of coverage was both correct and reasonable as a matter of law.  Without a bad faith cause of action, there can be no punitive damages.  *Manis v. Hartford Fire Ins. Co.,* 1984 OK 25, ¶¶ 11-13, 681 P.2d 760, 762; *Duensing v. State Farm*, 2005 OK CIV APP 15, 131 P.3d 127, 128.  Moreover, a plaintiff will not be routinely entitled to punitive damages even if bad faith exists.  *Sims v. Great American Life Ins. Co*., 469 F.3d 870, 891-894 (10th Cir. 2006); *McLaughlin v. National Benefit Life Insurance Co.*, 1988 OK 41, 772 P.2d 383.  Indeed, a plaintiff can establish an insurer's bad faith without sufficient grounds to support submission of the issue of punitive damages, as bad faith does not require the wanton or reckless disregard necessary for punitive damages.  *Cooper v. National Union Fire Ins.,* 1996 OK CIV APP 52, 921 P.2d 1297.  In the absence of "oppression, fraud or malice, actual or presumed," punitive damages cannot be submitted to the jury.  23 O.S. § 9(A).

CSAA made a valid and proper investigation of Plaintiffs' claims – there was no chicanery or other underhanded conduct here.  Thus, the Court should enter judgment against Plaintiffs' claim for punitive damages.

## CONCLUSION

For the reasons set forth herein, CSAA respectfully requests the Court enter judgment in its favor and against Plaintiffs' claims in their entirety.

19

Respectfully Submitted,


*s/Matthew C. Kane*
GERARD F. PIGNATO, OBA No. 11473
MATTHEW C. KANE, OBA No. 19502
JOSHUA K. HEFNER, OBA No. 30870
RYAN WHALEY COLDIRON JANTZEN PETERS
 & WEBBER PLLC
400 North Walnut Avenue
Oklahoma City, OK  73104
Telephone:    (405) 239-6040
Facsimile:    (405) 239-6766
jerry@ryanwhaley.com
mkane@ryanwhaley.com
jhefner@ryanwhaley.com

*Attorneys for Defendant*


## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of March, 2020, I electronically transmitted the attached document to the Clerk of Court using the Electronic Case Filing System for filing. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to the following:

Douglas J. Shelton – dshelton@sheltonlawok.com
Erica R. Mackey – emackey@sheltonlawok.com


*s/Matthew C. Kane*
MATTHEW C. KANE

20