# EXHIBIT 2

```
 1            IN THE DISTRICT COURT OF OKLAHOMA COUNTY
                        STATE OF OKLAHOMA
 2

 3   TAMMY COVINGTON and         )
     JEFFREY COVINGTON,          )
 4                               )
          Plaintiffs             )
 5                               )
     v.                          )  Case No. 19-cv-00718-PRW
 6                               )
                                 )
 7   CSAA FIRE AND CASUALTY      )
     INSURANCE d/b/a AAA FIRE    )
 8   AND CASUALTY INSURANCE      )
     COMPANY, INC.               )
 9                               )
          Defendants             )
10

11

12

13           DEPOSITION OF JEFFREY COVINGTON

14          TAKEN ON BEHALF OF THE DEFENDANT

15             IN OKLAHOMA CITY, OKLAHOMA

16                ON FEBRUARY 21, 2020

17                     9:04 a.m.

18

19

20   REPORTED BY:  WENDY SMITH, CSR

21

22

23

24

25
```



```
 1                 You spoke to Heather Davis shortly after
 2   you met with Ian on Mother's Day, correct?
 3        A.   Yes.
 4        Q.   Was it within a day or two of Mother's Day?
 5        A.   I believe I called and talked to the
 6   switchboard operator on Monday, probably, and I'm not
 7   sure if Heather Davis called that day or the next day.
 8   I believe it was pretty quickly after that.
 9        Q.   Okay.  You had that first conversation, and you
10   mentioned that she had told you something about
11   mitigation, correct?
12        A.   Yes.
13        Q.   Okay.  And did she say that she would follow
14   up, or what was the ending of that first conversation
15   with Heather Davis?
16        A.   I believe she said that she was going to get
17   a -- an estimator out to come look at it from her
18   company and -- and mitigate.
19        Q.   Okay.  So are you talking about, when you say
20   "estimator," like a field adjuster?
21        A.   Right.
22        Q.   Okay.  And did you speak with Heather Davis
23   after that first phone call, at any time thereafter?
24        A.   I don't remember.  I don't think I did.
25        Q.   Okay.  Do you know if your wife ever spoke with
```



```
 1   with MetLife were very -- very genuine, very kind.
 2   There had been times maybe we had some disagreements,
 3   but we'd always come back together.
 4        Q.   Right.
 5        A.   And it never got loud or unprofessional.  And
 6   that entire conversation may have started
 7   professionally, but after just a few seconds, it
 8   turned -- it turned bad.
 9        Q.   Do you think Heather Davis may have been a
10   little shocked that AAA was first contacted nine months
11   after the actual incident took place?
12        A.   I --
13             MS. MACKEY:  Object to form.
14             You may answer.
15        A.   I would -- I would assume that.
16        Q.   (BY MR. HEFNER)  Particularly when the contract
17   says that you have a duty to promptly notify AAA of a
18   loss, correct?
19             MS. MACKEY:  Object to form.
20             You can answer.
21        A.   I -- I would assume so, yes.
22        Q.   (BY MR. HEFNER)  Okay.  Because we're all
23   human, and sometimes things can be shocking, and maybe
24   that was the --
25        A.   And I understand that.
```



1    Q.  Okay.  But Heather Davis didn't tell you that
2  the claim was denied at that time, did she?
3    A.  No.
4    Q.  Okay.  But at some point you were informed that
5  the claim was denied, correct?
6    A.  Yes.
7    Q.  And how did you first come to be aware of that?
8    A.  Ian invited us to come to his office, and
9  maybe -- maybe he mailed it.  Maybe the letter was
10 mailed to us.  I think he knew before we did, though,
11 that it was going to be denied by Danielle Perez.  And
12 he talked to her on the phone.  She was very nice, very
13 cordial on the phone, very different from the other
14 conversations that any of us had had with -- with
15 Heather Davis or Alan.  I don't remember his last name,
16 but -- and she just pleasantly said, "Yeah, this is
17 going to be denied."
18   Q.  Okay.  So a letter was sent for denial,
19 correct?
20   A.  Yes.
21   Q.  Did you see that letter?
22   A.  Yes.
23   Q.  Did you read that letter?
24   A.  I believe I did.  I don't remember what it said
25 exactly.



1    Q.  The main drain.  But did you ever determine on
2  your own if it was, in fact, an issue with the main
3  drain line or with the AC condenser?
4    A.  I did -- I did not.
5    Q.  Okay.  But AAA sent out -- the first sentence
6  of the paragraph that we're reading from says, "Alan
7  Heise, a AAA field adjuster, Matthew Amick with Hi-Tech
8  Plumbing, and Danny Griffin with Boardwalk Flooring."
9        So they had three different people look at
10 your home; is that correct?
11   A.  Yes.
12   Q.  Okay.  And together they came up with the
13 conclusion that the AC condenser drain line had an issue
14 with it that allowed for constant repeated seepage of
15 leakage water.  I'm not saying you agree with that.  In
16 fact, I know you don't.  You've filed a lawsuit.
17        But do you think it may have been
18 reasonable for them to reach that conclusion?
19            MS. MACKEY:  Object to the form.
20   A.  I believe that there was some sweating of the
21 pipe under the house.
22   Q.  (BY MR. HEFNER)  Okay.
23   A.  That is all I've ever seen.
24   Q.  Okay.  When have you seen sweating on that
25 pipe?



```
 1              Let me back up.  What pipe are you talking
 2   about, the AC drain line?
 3        A.   Under the floor.
 4        Q.   Of the AC unit?
 5        A.   Yes.
 6        Q.   Okay.  When do you remember seeing sweating on
 7   that pipe?
 8        A.   When I went down there however long it was from
 9   the time that that happened until later.  A few days
10   after, it was not leaking on anything.  It was dripping
11   straight onto the dirt.
12        Q.   Okay.  So the event that you described earlier
13   was on August 8, 2017, and there was standing water
14   underneath your AC unit.  We've established that.
15        A.   (Witness nods head.)
16        Q.   And you're saying a day or two, maybe three
17   later, when you were underneath the crawl space, you saw
18   sweating on the drain line from the AC unit, correct?
19        A.   Yes.
20        Q.   Okay.  So how is it that you're
21   separating -- or let me back up.
22              I need to ask this:  That sounds like there
23   was still an issue with the drain line if there was
24   condensate or liquid on the outside of the pipe, right?
25        A.   Water had drained through the subfloor into
```



1  three?

2      Q.  Okay.  I mean, that's a semantic battle, I
3  guess, and I totally appreciate your disagreement with
4  that.  That's your right to disagree.

5          I'd like to turn now to the petition that's
6  been filed in this case.  Have you seen this petition,
7  Mr. Covington?

8      A.  I believe I have.

9      Q.  Okay.  Before we actually get into it, I'd like
10 to ask you -- we just looked at a letter dated July
11 19th, 2018, from AAA -- and I've already lost it -- and
12 it was from Danielle Perez.

13         And I think you had testified earlier that
14 your understanding of Danielle Perez is that she's been
15 nothing but kind and reasonable; is that correct?  Maybe
16 not reasonable, in your opinion, but she's at least been
17 kind?

18     A.  She was professional.

19     Q.  Professional.  Okay.  And Danielle Perez sent
20 the letter on July 19th, and I think she also sent the
21 letter on July 10th, 2018.  Okay.  That's correct.

22         Did you ever speak directly with Danielle
23 Perez yourself?

24     A.  No.

25     Q.  Okay.  And so as far as you know, you spoke



```
 1   with Heather Davis once?
 2        A.   (Witness nods head.)
 3        Q.   Did you speak with any other AAA representative
 4   at any time after that related to this loss?
 5        A.   No.
 6        Q.   So all other conversations between AAA and
 7   anybody representing you would have been Ian; is that
 8   correct?
 9        A.   Correct.
10        Q.   And after the letter dated July 19th, 2018, was
11   sent, did Ian share this letter with you?
12        A.   I'm pretty sure he did.  I believe so.
13        Q.   Do you remember talking about the expert report
14   with Ian after this letter was sent?
15        A.   Yes.
16        Q.   Do you remember Ian saying anything about that
17   expert report?
18        A.   About our expert?
19        Q.   Yes.
20        A.   He did talk about it.
21        Q.   And what was his reaction to this letter or his
22   comments in regards to the engineering report?
23        A.   They did not agree.
24        Q.   What did not agree?
25        A.   I --
```



1     A.  I did not.  I was suggested not to, and I had
2  no reason to talk to Alan at that point.
3     Q.  So I understand that Ian has told you that Alan
4  was unprofessional, but I'm trying to establish when AAA
5  was unprofessional with you directly.
6     A.  When Heather called me.
7     Q.  And what was it on that phone call that was
8  unprofessional, in your opinion?
9     A.  The raised voice, repeating the same things
10 over and over again, like was I not listening.  I don't
11 know.  Like being scolded by a teacher or something,
12 without an instruction why or what to do.
13    Q.  Okay.  And I do appreciate your testimony in
14 that regard.
15         Besides the conversation with Heather, can
16 you tell me about any other times in which AAA acted
17 unprofessionally toward you or your wife?
18    A.  No.
19    Q.  I know I handed you the petition, but I'm going
20 to backtrack on that a little bit.  I'd actually like to
21 talk first about answers to written discovery.
22         Do you happen to know what written
23 discovery is in regards to a lawsuit?  It's not a trick
24 question.
25    A.  You're asking for certain pieces of information



```
 1      Q.  (BY MR. HEFNER)  Let me ask it this way:  As we
 2   sit here today, do you think your policy does, in fact,
 3   cover constant and repeated leakage of water?
 4              MS. MACKEY:  Same objection.
 5      A.  I do not feel it would cover it over years of
 6   time, but I believe there would be a time frame to where
 7   it would be acceptable.  And that is not clear.
 8      Q.  (BY MR. HEFNER)  Request for Admission Number
 9   14 -- this is Page 4 of the document that I'm referring
10   to -- it asks:  Admit Defendant timely carried out the
11   claims-handling process.
12              Response:  Admitted.
13              So, sir, you've already admitted in this
14   lawsuit that the Defendant timely carried out the
15   claims-handling process.
16              So when Heather first took your phone call
17   or placed a phone call out to you, is it your testimony
18   that AAA did timely respond to your claim?
19      A.  I believe they did.
20      Q.  Wouldn't that be a professional way to act?
21      A.  That part of it, yes.
22      Q.  So you don't have any complaint about the time
23   frame in which AAA carried out their investigation, do
24   you?
25      A.  No.
```



1  Beyond that, I'm not sure.
2      Q.  And I believe that Mr. Rupert provided some
3  estimations.  I'm turning to what has been previously
4  marked by the Plaintiffs as Covington 194 through
5  Covington 196, and it is a letter to CSAA from Ian's
6  Enterprise on behalf of the insured dated Tuesday, July
7  10th, 2018.
8           On Page Covington 195, there are some
9  dollar figures sort of in the bottom middle of the page.
10 Do you see those figures, sir?
11     A.  Yes.
12     Q.  And just to read, it says that the mitigation
13 costs are estimated at $13,641.32.
14          Has any mitigation actually taken place on
15 this subject property after August 8, 2017?
16     A.  No.
17     Q.  Is there a reason why mitigation hasn't taken
18 place?
19     A.  We were waiting to see what was going to
20 happen, and didn't feel that -- we knew there may be
21 some more damage that does happen, but -- so we're not
22 concerned about it at this point.
23     Q.  Do you think the floor is worse today than it
24 was in May of 2018 when Ian first saw it?
25     A.  A little.



```
 1  Flooring, correct?
 2       A.  Yes.
 3       Q.  So they sent out their own field adjuster, they
 4  sent out a plumber, and they sent out a flooring guy.
 5               What more could they have done that would
 6  have made you think that their investigation was proper?
 7       A.  I think that Hi-Tech Plumbing was probably in
 8  their pocket, my own personal opinion, and stated what
 9  they wanted to hear.
10       Q.  Do you have any facts or evidence to back up
11  that allegation?
12       A.  I do not.
13       Q.  So because, you know, what's going to be
14  presented to the jury is not going to be allegations;
15  it's going to be facts or evidence that lead the jury to
16  conclude facts.
17               Do you have any evidence that Hi-Tech
18  Plumbing was in the back pocket of AAA?
19       A.  I don't.
20       Q.  Beyond sending out the field adjuster, the
21  plumber, and the flooring guy, what do you think AAA
22  should have done after that?
23       A.  They could have hired an engineer.
24       Q.  You think an engineer was necessary to assess
25  the damage to the flooring?
```



1      A.   I don't believe that the flooring man really
2   gave them very much information.  So when you talk about
3   they hired a flooring guy, it said it was wet under
4   there and there was no glue and there was no nails, and
5   that's all I remember him saying.  So he kind of agreed
6   with the fact that there was no glue on the floor.
7   Beyond that, he pulled up one piece in the bedroom and
8   did nothing else.
9      Q.   Your own engineer said there was no glue on the
10  floor as well, though, right?
11     A.   I'm not disputing that.  I'm saying that the
12  flooring guy didn't have a lot to offer.
13     Q.   Okay.  But what could an engineer working for
14  AAA have identified that your own engineer did not
15  identify?
16     A.   I don't know.
17     Q.   As a result of what you allege is bad faith on
18  the part of AAA, have you suffered any financial loss?
19     A.   Not up to this point, no.
20     Q.   As a result of the actions that you allege are
21  bad faith on the part of AAA, have you felt any
22  embarrassment?
23     A.   Yes.
24     Q.   Okay.  Describe that for me.
25     A.   The conversation with Heather Davis.  And I was



```
 1         Q.  -- in the public?
 2         A.  Not in front of any other people besides my
 3   wife and my brother-in-law.
 4         Q.  Have you suffered any mental pain or suffering
 5   from the actions of AAA that you allege constitute bad
 6   faith?
 7         A.  Not that I'm aware of.
 8         Q.  So no nightmares?
 9         A.  No.
10         Q.  Have you been to a counselor about any of these
11   events?
12         A.  No.
13         Q.  Have you ever been to a counselor for any
14   reason?  What I mean by "counselor" is psychologist,
15   psychiatrist, that sort of thing.
16         A.  No.
17         Q.  Turning back, Mr. Covington, to the petition
18   we've been making our way through, Page 4, the top of
19   the page, subheading that's listed "Punitive Damages."
20              Based on your own knowledge, do you know
21   what punitive damages are?
22         A.  Not exactly, no.
23         Q.  I'll represent to you punitive is sometimes
24   used in place of the word "punish," and so it could be
25   considered damages that punish somebody for the actions.
```



1   And that's in excess of the damages that you say you've
2   suffered for the breach of contract.
3              So before I talk about the punitive
4   damages, I'd like to ask you what damages you're
5   alleging you have suffered as a result of the actions of
6   bad faith that you think AAA did in this case?  So I'm
7   not talking about punitive.  I'm talking about bad
8   faith.
9              What damages have you suffered as a result
10  of what you allege are AAA's bad faith actions?
11       A.   I don't know.
12       Q.   Is there anything you can tell me about their
13  bad faith actions that has affected you adversely, their
14  actions that you allege are bad faith?  Let me rephrase
15  that.
16       A.   Their lack of professionalism.  Beyond that,
17  I'm not sure.
18       Q.   I understand the lack of professionalism.  But
19  what I'm trying to ask you is how that lack of
20  professionalism that you allege occurred in this case,
21  how did that damage you?
22       A.   I don't know.
23       Q.   Because we've talked about contractual damages,
24  and that's probably a little more clear, right?  There's
25  a contract.  You say they should have paid for the



1  repairs that haven't even taken place yet, but if they
2  did, AAA should pay for those.  And so it's kind of easy
3  to understand what contractual damages are.  There's a
4  contract; they should pay; they don't pay.  Those are
5  damages.
6         Bad faith is a little bit tougher, and
7  that's why I'm asking about, for instance, financial
8  loss because of the bad faith actions, and you said
9  there was no financial loss.  I asked you about mental
10 pain and suffering.  You said there's no mental pain and
11 suffering.  You did mention embarrassment, and it was
12 only between you, your wife and your brother-in-law.
13        So has there been a time in which you've
14 talked to a neighbor and you were embarrassed about the
15 situation, or you went to try to get a loan and you
16 couldn't because of the actions of AAA that you allege
17 are bad faith, anything like that that you can tell me
18 about?
19    A.  Well, we are going to have to pay for the floor
20 to be repaired, so that is damages that are oncoming.
21    Q.  Right.  But we've talked about that's the
22 breach of contract claim that you're making.
23        I'm talking about the actions that you say
24 were unprofessional.  Because you're asking for a
25 separate set of damages.  You're saying there's a



```
 1  contract; I'm owed this; but for the bad faith, I'm owed
 2  this.
 3              So I'm trying to understand what it is
 4  you're going to ask a jury for in regards to the bad
 5  faith actions you allege occurred in this loss?
 6      A.   I'm not sure.
 7      Q.   Okay.  So turning back to Page 4 with the
 8  punitive damages.  So we've talked about the contractual
 9  damages.  We were able to identify some numbers.  Maybe
10  that changes.  That's fine.  I understand a jury could
11  award you anything.
12              You weren't able to tell me about bad faith
13  damages.  And now we're turning to punitive damages.
14              MS. MACKEY:  Object to the form.
15      Q.   (BY MR. HEFNER)  On punitive damages, it says
16  here:  The Defendant's actions in denying any payment
17  for the covered claims for the Plaintiff is
18  unreasonable, intentional and in total disregard for the
19  rights of Plaintiffs, thus entitling Plaintiffs to
20  punitive damages from Defendant.
21              Next paragraph:  Defendant should be
22  punished for its unreasonable actions, and Defendant
23  should be made an example of so that other insureds
24  similarly situated are dissuaded from taking the same
25  unreasonable action of this Defendant.
```



1    Q.  Because the law in Oklahoma is that an insured
2  has a duty to mitigate damages; they don't need approval
3  from an insurance company to do so.  I'll represent that
4  to you and, of course, listen to your counsel and not me
5  on that.  But that duty to mitigate arises the moment a
6  loss occurs.  It doesn't require an insurance company to
7  allow you to mitigate.
8           So I just want to be clear.  At any time,
9  did AAA tell you to not mitigate your damages?
10   A.  No.
11   Q.  We've been talking about damages.  Have you
12  ever lost any wages, any income from work, because of
13  the loss that we're talking about today?
14   A.  I've had to take off time to speak with people.
15   Q.  Are you making a claim for lost wages in this
16  lawsuit?
17   A.  Not that I know of.
18   Q.  Do you intend on doing so in front of the jury
19  if it goes to trial?
20   A.  Not that I'm aware of.
21   Q.  Do you feel like you've lost any reputation in
22  the community as a result of what you allege AAA's bad
23  faith actions are?
24   A.  No.
25   Q.  Is there anyone out there that thinks less of

