## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

TAMMY COVINGTON and               )
JEFFREY COVINGTON,                )
                                  )
              Plaintiffs,         )
                                  )
v.                                )          Case No. CIV-19-00718-PRW
                                  )
CSAA FIRE AND CASUALTY INSURANCE, )
d/b/a AAA FIRE AND CASUALTY       )
INSURANCE COMPANY, INC.,          )
                                  )
              Defendant.          )

## <u>MEMORANDUM OPINION AND ORDER</u>

The floors of a home were damaged by a water leak from an HVAC condensate drainpipe, prompting the homeowners to file a claim with their insurer. The insurer sent three inspectors to determine the precise cause and scope of the damage, while the homeowners brought in two inspectors of their own. Based on those inspections, the insurer concluded that the damage was not covered by the policy and denied the claim. The homeowners brought suit for breach of contract, bad faith, and punitive damages. Now, the defendant-insurer seeks summary judgment on all claims. The homeowners, in response, contend that summary judgment is inappropriate because there are genuine disputes of material fact. For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment (Dkt. 15).

*Background*

I.   *Undisputed Facts*

The material, undisputed facts are as follows. Plaintiffs, Tammy and Jeffrey Covington, resided in a home in Choctaw, Oklahoma.[1] Plaintiffs entered into a contact with Defendant, AAA Fire and Casualty Insurance Company, Inc. ("CSAA"), to insure that residence against certain hazards (the "Policy").[2] For example, the Policy covered loss attributable to "accidental discharge or overflow of water . . . from within . . . plumbing or air conditioning."[3] But the Policy was not without limits. Damages arising from certain circumstances and occurrences were expressly excluded from coverage. Three of those exclusions are germane to the instant motion:

1.  The Policy did not cover losses caused by "[c]onstant or repeated seepage or leakage of 'water' or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of 'water' or the presence or condensation of humidity, moisture or vapor [wa]s unknown to all 'insured' and [wa]s hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure."[4]

2.  The Policy did not cover losses caused by "faulty, inadequate, or defective: design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; materials used in repair, construction, renovation or remodeling; or maintenance."[5]

---

[1] *See* Pet. (Dkt. 1, Ex. 1) ¶ 1.

[2] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 1; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 10.

[3] *See* Insurance Policy (Dkt. 30, Ex. 1) at 30.

[4] *Id.* at 79.

[5] *Id.* at 42.

3.  The Policy did not cover losses caused by mold, fungus, or wet rot, except under limited circumstances.[6]

The Policy was implicated when, on or about August 8, 2017, Plaintiffs' home suffered a noticeable water leak.[7] Plaintiffs cleaned up that water with towels and used box fans and air movers to dry the area.[8] Then, a few days later, Plaintiff Jeffrey Covington crawled under the home to investigate the incident.[9] There, he noticed "[a] sweating . . . pipe" that was "dripping straight into the dirt."[10]

About nine months later, on May 13, 2018, Ian Rupert, a public adjustor and Mrs. Covington's brother, visited the residence.[11] While there, Mr. Rupert noticed moisture damage to the floor.[12] So, two days after that, Mr. Covington contacted CSAA to file an insurance claim under the Policy for that damage.[13]

---

[6] *Id.* at 35.

[7] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 3; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 5.

[8] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 3; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 5.

[9] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 3; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6.

[10] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 3; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6.

[11] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 3–4; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6.

[12] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 4; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6.

[13] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 4; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6.

Mr. Covington spoke with CSAA Representative Heather Davis.[14] While Mr. Covington testified that Ms. David had a "raised voice" and that he felt like he was "being scolded by a teacher," ostensibly for his failure to file the claim sooner, CSAA did not deny the claim over the phone.[15] Rather, CSAA sent three individuals to inspect the damage: Matthew Amick of Hi-Tech Plumbing & Leak Detect, Inc.; Alan Heise, a AAA Field Adjuster; and Danny Griffin of Boardwalk Flooring.[16] At the completion of their respective inspections, each compiled a written report detailing their observations and conclusions.[17]

Mr. Amick noted, as to the source of the leak, that "the condensation drain [was] improperly installed" and concluded that "the improper installation of the condensation drain contributed to the clogging and overflowing over the HVAC drain into the home."[18] He also observed that "the humidity level [in the crawlspace beneath the home was] so high that the PVC building condensation drain [wa]s sweating and dripping water under

---

[14] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 8–9.

[15] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 4, 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6, 8–9.

[16] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 4–7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6–7.

[17] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 4–7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6–7.

[18] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 6; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6–7.

the home"[19] and stated his belief "that the lack of proper crawl space ventilation . . . caused high humidity and condensation on the wood under the home."[20]

Mr. Heise concluded that "the cause of the majority of the floor damage throughout the home [wa]s due to a lack of moisture barriers and inadequate crawlspace ventilation" and that "[g]enerally high moisture over a period of months [or] years appears to have gradually and progressively damaged the bamboo flooring throughout the home."[21]

Mr. Griffin also found high moisture readings throughout the home and water damage near the leaking air-conditioning unit.[22] He concluded that "the AC was leaking for quite some time causing water to get trapped under the flooring and between the barrier, if any."[23]

Plaintiffs brought in an inspector as well: Michael Moriarity of Smith Brothers Heat and Air. Mr. Moriarity reported that his "inspection of the heat and air installation did not reveal any malfunction or code violation that would result in a sudden discharge of water on account of the unit itself."[24] "However," Mr. Moriarity continued, "we can confirm the

---

[19] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 6; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6–7.

[20] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 6; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6–7.

[21] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 5–6; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 6.

[22] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7.

[23] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7.

[24] Letter from Smith Brothers (Dkt. 24, Ex. 4) at 1.

condensate drain line attaches to another drain line that, based on its elevation, indeed could clog resulting in an overflow . . . ."[25] To mitigate this risk, Mr. Moriarity recommended the "installation of an optional emergency drain pan and float underneath the heat and air unit."[26] He also "note[d] that high heat during the month of August 2017 . . . routinely causes air condition units to produce gallons of condensation per hour" and that "[t]he amount of water likely produced [during the August 2017 flooding incident] aligns with the severity of wood flooring damage found during [his] inspection."[27] "Since there [wa]s no moisture barrier, this level of water would be expected to spread-out then seep thr[ough] the finish flooring soaking the subfloors."[28] In conclusion, Mr. Moriarity "concur[red] with the Covington explanation for the water damaged flooring and subfloors."[29]

With these inspection reports, Defendant proceeded to deny the claim, arguing that the damage at issue was not covered by the Policy.[30] Specifically, Defendant concluded that the damage at issue "was caused by improper construction": the lack of "ventilation in the crawlspace along with a lack of maintenance to the AC condenser drain line" resulted in the "constant or repeated seepage o[r] leakage of water over a period of weeks, months,

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7.

or years resulting in visible water damage throughout the home and mold in the furnace room."[31]

Subsequently, Plaintiffs sought and obtained a second opinion from Don Roy Sharp, an engineer.[32] Mr. Sharp noted, as to the source of the leak, that "HVAC condensate lines can easily be clogged by microbial growth . . . especially if the line is laid at too flat of a slope."[33] To avoid this issue, he "encouraged [the property owner] to have the drain pipe relaid at a positive slope."[34] He also observed that "the crawlspace was extremely humid" and found evidence of "mildew and mold in the subfloor" "and to a lesser extent in the floor joists."[35] He found that "the surface flooring was not glued," causing "water flow [to] spread out in the voids between the finish floor and the subfloor . . . until being absorbed into the wood or seeping into the crawlspace below."[36] In his estimate, "110-120 gallons of water would be required, at a minimum, to account for the deterioration witnessed."[37] He continued:

---

[31] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7.

[32] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7–8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7–8.

[33] Don Sharp Report (Dkt. 24, Ex. 7) at 3.

[34] *Id.*

[35] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7–8.

[36] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7–8.

[37] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7–8.

While this is not impossible over the course of 1 day, it is not likely. This author believes that, given the weather conditions and the size of the unit, this particular air condition would produce 0.50–.75 gallons per hour (roughly 15 gallons per day).

It is the opinion of this author that the damage occurred over multiple days (and possibly several weeks). The engineer believes that once the clog manifested in the drain line of the HVAC, the property owners were oblivious to the water flow for some time. It was only after the subfloor had become fully saturated that the water discharge backed up enough to become evident on the surface. It is likely that during this time, there was continuous standing water in the utility closet, seeping into the spaces between the surface and subfloor; unless the owners had reason to open the utility closet, they would have remained oblivious to the ongoing damage.[38]

Finally, Mr. Sharp noted that "[t]he subfloor [wa]s contaminated with white mold . . . ."[39]

CSAA reviewed the report from Mr. Sharp.[40] In its view, Mr. Sharp's report corroborated its reasons for denying the claim.[41]

## II.   *Factual Disputes*

Plaintiffs and Defendant put forth competing accounts of the origin of the damage at issue. "Plaintiffs claim that on August 8, 2017, their HVAC condensate drain line clogged and failed, causing a leak and damage to the wood floors of their home. Plaintiffs claim this was a one-time flooding event. It was not constant or repeated . . . ."[42] Defendant,

---

[38] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7–8.

[39] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 7–8.

[40] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 8.

[41] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 8.

[42] Pls.' Resp. to Def.'s Suppl. to Mot. for Summ. J. (Dkt. 72) at 1.

on the other hand, argues that the water damage was caused gradually, over the nine months after that incident, the product of a slow, continuous leak known to the insured tracing back to faulty, inadequate, or defective construction or maintenance.[43]

### *Legal Standard*

Federal Rule of Civil Procedure 56(a) requires "[t]he court [to] grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines only whether there is a genuine dispute for trial before the fact-finder.[44] The movant bears the initial burden of demonstrating the absence of a genuine, material dispute and an entitlement to judgment.[45] A fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim.[46] A dispute is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.[47]

If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular

---

[43] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15).

[44] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015).

[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[46] *Anderson*, 477 U.S. at 248; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[47] *Anderson*, 477 U.S. at 248; *Adler*, 144 F.3d at 670.

parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine dispute"; or by "showing . . . that an adverse party [i.e., the movant] cannot produce admissible evidence to support the fact."[48] The nonmovant does not meet its burden by "simply show[ing] there is some metaphysical doubt as to the material facts,"[49] or by theorizing a "plausible scenario" in support of its claims.[50] "Rather, 'the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[51] If there is a genuine dispute as to some material fact, the district court must consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party.[52]

---

[48] Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006).

[49] *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995)).

[50] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[51] *Neustrom*, 156 F.3d at 1066 (quoting *Anderson*, 477 U.S. at 251–52; *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993)).

[52] *Scott*, 550 U.S. at 380; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

*Analysis*

I.   *Breach of Contract Claim*

To recover for breach of contract, Plaintiff must, of course, establish a breach of contract.[53] Defendant argues that summary judgment in its favor on the breach of contract claim is appropriate because, according to the undisputed facts, several provisions of the insurance policy specifically exclude the damage at issue from coverage and therefore foreclose the existence of a breach of contract as a matter of law. The Court addresses the applicability of each of these provisions in turn, as necessary.

First, Defendant argues that the damage at issue falls within the exclusion for damage caused by "[c]onstant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years." The Court finds that summary judgment on the basis of this exclusion is inappropriate because there is a genuine dispute as to whether the damage was caused by a sudden influx of water, which would be covered by the insurance policy, or a slow, continuous leak, which, if apparent or known to the homeowners, would not be covered by the insurance policy.

While the inspectors generally agree that the damage was likely caused by a slow, continuous leak, Plaintiffs do present some evidence to the contrary. For example, Mr. Moriarity, in his report, notes that high heat, like that in August 2017, "routinely causes air

---

[53] *See Cates v. Integris Health, Inc.*, 2018 OK 9, ¶ 11, 412 P.3d 98, 103.

conditioning units to produce gallons of condensation per hour."[54] He then specifically concludes that "[t]he amount of water likely produced [during the August 2017 flooding incident] aligns with the severity of wood flooring damage found during [his] inspection."[55] Likewise, Mr. Sharp, in his report, states that, while improbable, it "is not impossible [that the water damage at issue was caused] over the course of 1 day."[56] Thus, whether this exclusion applies turns on facts still in dispute.

Next, Defendant argues that the damage at issue falls within the exclusion for damage caused by "faulty, inadequate, or defective: design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; materials used in repair, construction, renovation or remodeling; or maintenance." Specifically, Defendant points to inadequate ventilation of the crawlspace, the absence of a moisture barrier between the finish floor and subfloor, and the improper installation of the condensation drain.[57] Plaintiffs argue, in response, that there is a genuine dispute of material fact because (1) "Plaintiffs . . . state that the cause of the leak was due to a clog in the condensate line" and (2) Michael Moriarity of Smith Brothers Heat and Air found "that there was no faulty construction."[58] The Court finds that summary judgment on the basis of this exclusion is appropriate because there is no genuine dispute of material fact that construction faults,

---

[54] Letter from Smith Brothers (Dkt. 24, Ex. 4) at 1.

[55] *Id.*

[56] Don Sharp Report (Dkt. 24, Ex. 7) at 3.

[57] Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 13.

[58] Pls.' Resp. to Def.'s Mot. for Summ. J. (Dkt. 24) at 13–14.

defects, or inadequacies caused the damage at issue: The Parties brought in a total of five inspectors of various background, including a flooring specialist, an engineer, a plumbing specialist, and a heating and air conditioning specialist, and all five traced the damage back to construction issues.

As to the source of the water leak, three of the individuals to inspect the damage, including both individuals hired by Plaintiffs, found, either explicitly or implicitly, that the condensation drain was improperly installed and opined that such improper installation caused the leak at issue. Mr. Amick expressly found that "the condensation drain [was] improperly installed" and concluded that the improper installation "contributed to the clogging and overflowing over the HVAC drain into the home." Mr. Sharp, meanwhile, noted that "HVAC condensate lines can easily be clogged by microbial growth . . . especially if the line is laid at too flat of a slope" and "encouraged [Plaintiffs] to have the[ir] drain pipe relaid at a positive slope." Finally, Mr. Moriarity "confirm[ed that] the condensate drain line . . . , based on its elevation, indeed could clog resulting in an overflow . . . ." The other two individuals to inspect the damage, one a flooring specialist and the other a field adjuster, expressed no opinion one way or the other as to the correctness of the installation of the condensate drainpipe.

Further, of the five individuals to inspect the damage, all five noted the omission of a moisture barrier between the floor and subfloor, the inadequacy of the crawlspace ventilation, or both as actual or possible causes of the damage. Mr. Heise expressly attributed "the majority of the floor damage throughout the home . . . to a lack of moisture barriers and inadequate crawlspace ventilation." Mr. Amick found "that the lack of proper

crawl space ventilation . . . caused high humidity and condensation on the wood under the home." Mr. Griffin also found high moisture readings throughout the home and water damage near the leaking air-conditioning unit and concluded that "water [was] get[ting] trapped under the flooring and between the [moisture] barrier, if any." Mr. Moriarity noted that "[s]ince there is no moisture barrier, this level of water would be expected to spread-out then seep thr[ough] the finish flooring soaking the subfloors." Mr. Sharp, meanwhile, found that "the crawlspace was extremely humid" and also that "the surface flooring was not glued," causing "water flow [to] spread out in the voids between the finish floor and the subfloor . . . until being absorbed into the wood or seeping into the crawlspace below."

Taken together, there can be no genuine dispute that "defective, inadequate, [or] faulty" construction was to blame for the damage, from start to finish. The improper installation of the condensation drainpipe caused water to flow onto the floor of the home, where, because of the absence of a moisture barrier or glue between the floor and subfloor, it saturated the space between the finish floor and subfloor before absorbing into the finish floor and subfloor. The saturation of the subfloor, in turn, generated high humidity in the crawlspace below. And because of the inadequate ventilation in the crawlspace, this humidity persisted, resulting in mold on and around the subfloor and, in conjunction with the direct absorption just mentioned, the warping and delamination of the finish floor above.

Plaintiffs' two arguments to the contrary are unavailing. With respect to Plaintiffs' argument "that the cause of the leak was due to a clog in the condensate line," the evidence shows that that clog was, itself, the result of faulty construction. As discussed above, Mr.

Amick explicitly found that "the condensation drain [was] improperly installed," causing "clogging and overflowing over the HVAC drain into the home." And both of Plaintiffs' inspectors' findings support that conclusion: Mr. Moriarity "confirm[ed that] the condensate drain line . . . , *based on its elevation*, *indeed could clog* resulting in an overflow" and Mr. Sharp noted that "HVAC condensate lines can easily be clogged by microbial growth . . . especially if the line is laid at too flat of a slope" and then "encouraged [Plaintiffs] to have the[ir] drain pipe relaid at a positive slope."

With respect to Plaintiffs' argument that Michael Moriarity of Smith Brothers Heat and Air found "that there was no faulty construction," their argument distorts the facts and misses a critical distinction. Mr. Moriarity at no point concluded that "there was no faulty construction," as Plaintiffs suggest. Rather, Mr. Moriarity reported only that his "inspection of the heat and air installation did not reveal *any malfunction or code violation* that would result in a sudden discharge of water *on account of the unit itself*." Again, this distinction is critical. First, this finding appears to be limited only to the mechanical function of the heat and air unit itself, not the condensate drainpipe. Second, whether the HVAC unit malfunctioned or whether there was a code violation is only of tangential import because the dispositive consideration is whether there was a construction defect, inadequacy, or fault, and there can be both a construction defect, inadequacy or fault without an apparent malfunction or code violation. Put differently, a finding that there is a construction defect, inadequacy, or fault can be, and in this case is, perfectly consistent with the lack of an apparent malfunction of an appliance or a code violation. Moreover, Mr. Moriarity's own findings belie the very conclusion that there was no faulty construction. As mentioned

earlier, Mr. Moriarity specifically "confirm[ed that] the condensate drain line . . . , *based on its elevation, indeed could clog* resulting in an overflow" and then proceeded to recommend an alternative configuration. He also noted that "*[s]ince there is no moisture barrier*, this level of water would be expected to spread-out then seep thr[ough] the finish flooring soaking the subfloors." In short, Plaintiffs fail to demonstrate a genuine dispute of material fact and Defendant is entitled to judgment as a matter of law on the breach of contract claim.

Because the Court finds that the damage at issue falls within the exclusion for damage caused by "faulty, inadequate, or defective: design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; materials used in repair, construction, renovation or remodeling; or maintenance," it does not reach the last exclusion for damage "caused directly or indirectly by fungi, wet or dry rot, or bacteria, meaning the presences, growth, proliferation, spread or dry rot or bacteria."

## II.     *Bad Faith Claim*

The Court next turns to Defendant's argument that the Court should grant summary judgment in its favor on the bad faith claim. As a preliminary matter, the Court notes that a bad faith claim can stand even in the absence of a successful breach of contract claim.[59]

Defendant argues that summary judgment in its favor on the bad faith claim is appropriate for two reasons. First, Defendant argues that, according to the uncontested

---

[59] *See Vining on Behalf of Vining v. Enter. Fin. Grp., Inc.*, 148 F.3d 1206, 1214 (10th Cir. 1998) ("[A] plaintiff may bring a bad faith cause of action even though a legitimate defense to a breach of contract claim exists . . . ." (internal citations and quotation marks omitted)).

facts, it thoroughly investigated the claim and reasonably denied the claim on the basis of its investigation. Second, Defendant argues that Plaintiffs adduce no evidence of bias, corruption, or collusion between inspector and insurer, or of denial of the claim out of animosity, ill-will, or spite. The Court agrees with Defendant.

Under Oklahoma law, "[a]n insurer has an 'implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received.'"[60] "[T]he violation of this duty gives rise to an action in tort . . . ."[61]

"The core of a bad faith claim 'is the insurer's unreasonable, bad faith conduct, including the unjustified withholding of payment due under a policy.'"[62] To succeed on a bad faith claim, "the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim."[63]

To determine whether a plaintiff has made this showing, courts assess "whether the insurer had a good faith belief in some justifiable reason for the actions . . . that are claimed

---

[60] *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 26, 121 P.3d 1080, 1093 (quoting *Christian v. Am. Home Assurance Co.*, 1977 OK 141, 577 P.2d 899, 901).

[61] *Christian*, 1977 OK 141, 577 P.2d at 904.

[62] *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting *McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583, 587).

[63] *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993) (citing *McCoy v. Okla. Farm Bureau Mut. Ins. Co.*, 1992 OK 43, 841 P.2d 568, 572); *see also Garnett v. Gov't Emps. Ins. Co.*, 2008 OK 43, ¶ 22, 186 P.3d 935, 944 ("A party prosecuting a claim of bad faith carries the burden of proof . . . ."); *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995) ("[T]he insured must present sufficient evidence reasonably tending to show bad faith." (quotations omitted)).

violative of the [insurer's] duty of good faith and fair dealing."[64] Courts make this determination "in light of all facts known or knowable concerning the claim at the time plaintiff requested the company to perform its contractual obligation."[65] "[U]ntil the facts . . . have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed."[66]

Courts generally conduct this analysis in two steps.[67] First, the court considers whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim.[68] If there is no legitimate dispute between the parties, the court may infer that the insurer denied payment in bad faith.[69] But where there is a legitimate dispute between the parties, then "as a matter of law[,] . . . no reasonable inference of bad faith arises."[70]

Because "the denial of a claim based upon a legitimate dispute does not imply bad faith" as a matter of law, "judgment as a matter of law is to be granted to the insurer" unless the insured "produce[s] specific evidence of bad faith."[71] Thus, if the court determines

---

[64] *Badillo*, 121 P.3d at 1093–94.

[65] *Oulds*, 6 F.3d at 1439 (quotations omitted).

[66] *Id.* at 1437.

[67] *See Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1315 (10th Cir. 2019).

[68] *Id.*

[69] *See Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 2000 OK 55, ¶ 21, 11 P.3d 162, 171 (finding no legitimate dispute about the amount or extent of coverage and concluding that insurer denied payment in bad faith).

[70] *Timberlake*, 71 F.3d at 344 (quoting *Oulds*, 6 F.3d at 1442).

[71] *Oulds*, 6 F.3d at 1442.

there is a legitimate dispute between the parties, it proceeds to the second step of its analysis and considers whether the plaintiff offered specific additional evidence to demonstrate bad faith.[72] If the court determines that the plaintiff has offered sufficient evidence to show the insurer acted in bad faith, the court will send the case to a jury.[73]

The additional evidence required for this showing may take several forms. For example, a plaintiff may demonstrate bad faith by providing "evidence that the insurer did not actually rely on th[e] legitimate [dispute]" to deny coverage,[74] "denied the claim for an illegitimate reason,"[75] or otherwise "failed to treat the insured fairly."[76] A plaintiff may also show bad faith by providing evidence that the insurer performed an inadequate investigation of the claim.[77]

The Court will follow this two-step analysis. First, the Court will determine whether there is a legitimate dispute as to whether the damage at issue was covered by the insurance policy. Then, the Court will determine whether Plaintiffs have otherwise shown bad faith conduct by Defendant.

---

[72] *See Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128-32 (10th Cir. 2012) (identifying a legitimate dispute between the parties and then considering whether plaintiff had identified additional evidence of the insurer's bad faith).

[73] *Id.* at 1128; *see also Oulds*, 6 F.3d at 1442.

[74] *Bannister*, 692 F.3d at 1128.

[75] *Id.*

[76] *Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir. 1989).

[77] *See, e.g.*, *Oulds*, 6 F.3d at 1442.

a.  *There is a Legitimate Dispute as to Whether the Water Damage at Issue Was Covered by the Policy.*

Defendant denied coverage pursuant to two provisions of the Policy: (1) the exclusion for damage caused by slow, continuous leaks or constant humidity, moisture, or vapor known or apparent to the insured and (2) the exclusion for damage caused by faulty, inadequate, or defective construction.

The Court finds that Defendant's denial pursuant to the former exclusion, for losses caused by "[c]onstant or repeated seepage or leakage of 'water' or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of 'water' or the presence or condensation of humidity, moisture or vapor [wa]s unknown to all 'insured' and [wa]s hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure," was reasonable. As to knowledge and causation, Plaintiffs discovered water in their home in August 2017, when their home suffered a noticeable flood. Then, a few days later, when Mr. Covington went to investigate the situation, he noticed that "there was [a] sweating . . . pipe under the house" that was "dripping straight into the dirt." This arguably establishes that Mr. Covington's knew of a continuous leak and consequent high humidity in the crawlspace. And further as to causation, the first evidence of the damage at issue dates to May 13, 2018, when Ian Rupert visited the residence and noticed moisture damage to the floor. This arguably establishes that the damage occurred over the intervening months between Mr. Covington's investigation and Mr. Rupert's discovery. These facts alone support the

reasonable denial of the claim pursuant to this exclusion from the coverage of the insurance policy.

Even so, Defendant went further, sending three inspectors to assess the damage. And of these, all three noted high humidity in the crawlspace below the flooring and concluded that the damage to that flooring was likely the result of a slow, continuous leak. Moreover, though the Court only considers those facts "known or knowable concerning the claim at the time plaintiff requested the company to perform its contractual obligation,"[78] the subsequent, corroborating conclusion of Mr. Sharp that "the damage occurred over multiple days (and possibly several weeks)" provides further evidence that the conclusion reached by Defendant was reasonable. These undisputed facts, taken together, establish that Defendant had a reasonable basis for concluding that the damage was caused by a slow, continuous leak or high humidity, moisture, or vapor that was known to Mr. Covington and for denying coverage under that exclusion.

The Court also finds that Defendant's denial pursuant to the latter exclusion, for damage arising from faulty, inadequate, or defective construction or maintenance, was reasonable. Two of Defendant's inspectors expressly concluded that faults, defects, or inadequacies in construction caused the water damage.[79] Mr. Heise found that "the cause

---

[78] *Oulds*, 6 F.3d at 1439 (quotations omitted),

[79] The third inspector, Danny Griffin, while not specifically finding faulty, inadequate, or defective construction or maintenance, noted the possibility that there was no moisture barrier beneath the flooring and that the absence of such a barrier may have caused the damage at issue. *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 15) at 7 ("He suspected that 'the AC was leaking for quite some time causing water to get trapped under the flooring and between the barrier, if any.'").

of the majority of the floor damage throughout the home [wa]s due to a lack of moisture barriers and inadequate crawlspace ventilation." Mr. Amick found "the condensation drain to be improperly installed" and there to be insufficient crawlspace ventilation. He concluded that "the improper installation of the condensation drain contributed to the clogging and overflowing over the HVAC drain into the home" and that "the lack of proper crawl space ventilation . . . caused high humidity and condensation on the wood under the home." Meanwhile, Mr. Moriarity, who was brought in by Plaintiffs, specifically "confirm[ed that] the condensate drain line . . . , based on its elevation, indeed could clog resulting in an overflow" and then proceeded to recommend an alternative configuration. He also noted that "[s]ince there is no moisture barrier, this level of water would be expected to spread-out then seep thr[ough] the finish flooring soaking the subfloors." These undisputed facts clearly provide a reasonable basis for Defendant's denial of the claim pursuant to the exclusion for damage caused by faulty, inadequate, or defective construction or maintenance.

### b. Plaintiffs Fail to Offer Other Specific Evidence Demonstrating Bad Faith.

Plaintiffs fail to otherwise show bad faith. The generic and wholly unsubstantiated assertion that Defendant "did everything [it] could to find reasons to deny the claim"[80] is plainly insufficient to sustain a claim for bad faith on summary judgment. Likewise, Mr. Covington's feeling like he was "being scolded" by CSAA representative Heather Davis, ostensibly because he failed to file his insurance claim for nine months, is also not sufficient

---

[80] Pls.' Resp. and Obj. to Def.'s Mot. for Summ. J. (Dkt. 24) at 13–14.

to sustain a claim for bad faith. Again, the central inquiry is whether the insurer acted in good faith and treated the insured fairly. While the failure to act in good faith or to treat an insured fairly may arouse hurt feelings, the Court does not find hurt feelings occasioned by a "scolding" tone of voice sufficient to constitute evidence of bad faith. Moreover, the Court notes that Plaintiffs concede that Defendant "timely carried out the claims-handling process."[81]

Plaintiffs' argument that Defendant acted in bad faith by failing to adequately investigate their claim[82] fares no better. "'[W]hen a bad faith claim is premised on [an allegation of] inadequate investigation, the [claimant] must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information' that would have delegitimized the insurer's dispute of the claim."[83] Plaintiffs adduce no evidence that Defendant overlooked material facts or that a more thorough investigation would have produced evidence refuting Defendant's basis for denying their claim.

As to the former, Plaintiffs identify no material fact overlooked by Defendant. Instead, their sole argument on this point is that Defendant "clearly did not consider any additional information . . . [after] they received the report by the engineer Don Sharp."[84]

---

[81] *Id.* at 9.

[82] *See id.* at 19.

[83] *Bannister*, 692 F.3d at 1128 (quoting *Timberlake*, 71 F.3d at 345).

[84] Pls.' Resp. and Obj. to Def.'s Mot. for Summ. J. (Dkt. 24) at 19.

There is neither mention of the additional information that should have been considered nor explanation as to its effect.

As to the latter possible proof of bad faith, Defendant's investigation was undeniably thorough. Defendant brought in three inspectors, all of whom compiled detailed, written reports of their findings. While Plaintiffs argue that Defendant should have done more, like bring in an engineer to survey the damage, they identify no information that would have been uncovered by such additional inspection. Moreover, even if there was some marginal benefit from additional inspections, "[u]nder Oklahoma law, . . . an insurer's investigation need only be reasonable, not perfect."[85] The Court finds that three inspections conducted by professionals from a variety of backgrounds is, under these circumstances, more than reasonable.

Because the insurer had a reasonable basis for its conclusion that the damage at issue fell within an exclusion from coverage, and because the insured do not otherwise adduce evidence of bad faith, there can be no claim for bad faith as a matter of law. Accordingly, the Court will grant summary judgment in favor of Defendant on the bad faith claim.

---

[85] *Roberts v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 587, 592 (10th Cir. 2003) (unpublished) (citing *Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, 824 P.2d 1105, 1109).

### III.    Punitive Damages Claim

Plaintiffs' claim for punitive damages is predicated on their bad faith claim.[86] Because their bad faith claim fails as a matter of law, so too does their claim for punitive damages.[87]

### Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 15).

**IT IS SO ORDERED** this 23rd day of October, 2020.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[86] *See* Pet. (Dkt. 1, Ex. 1) ¶ 17 ("Defendant should be punished for its unreasonable actions and Defendant should be made an example of, so that other insurers similarly situated are dissuaded from taking the same unreasonable actions as this Defendant.").

[87] *See Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1320 (10th Cir. 2019) (". . . . Mr. Shotts's punitive damages claim is derivative of and dependent on his bad faith claims. Because both of those claims fail, his request for punitive damages must fail, too.").